UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CHRISTOPHER J. WATSON,

    Plaintiff,

v.

CITY OF BONNEY LAKE; MIKE MITCHELL, in his individual capacity; MARCUS KOEHN, in his individual capacity; and ROBERT KOCHER, in his individual capacity

    Defendants.

CASE NO. C10-5692BHS

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendants' motion for summary judgment based upon qualified immunity (Dkt. 27). The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants the motion for the reasons discussed herein.

## I. PROCEDURAL HISTORY

On March 15, 2011, the Court entered judgment on the pleadings, which dismissed Defendants Bonney Lake and Mike Mitchell. Dkt. 25. The only remaining Defendants are Officers Marcus Koehn ("Koehn") and Robert Kocher ("Kocher").

On April 7, 2011, Koehn and Kocher (collectively, "Moving Defendants") moved for summary judgment as to all claims against them based upon the affirmative defense of qualified immunity. Dkt. 27. On April 25, 2011, Plaintiff ("Watson") responded in

ORDER - 1

opposition to the motion. Dkt. 33. On April 29, 2011, Moving Defendants replied. Dkt. 37.

## II. FACTUAL BACKGROUND

This matter arises out of a lawful, but mistaken, arrest that led to the search and seizure of marijuana within Watson's residence. *See* Dkt. 22 (Amended Complaint). On November 10, 2008, Watson moved a vehicle, a Ford LTD, which he previously sold to Jeffery Ross ("Ross"). Amended Complaint ¶ 3.4. Koehn observed Watson operating that vehicle, which Watson turned around in the street and then pulled back into the driveway at 20602 Church Lake Drive in Bonney Lake, Washington. *Id*. ¶¶ 3.2, 3.4.

Koehn ran a routine records check on the Ford LTD's license plate; the tabs had expired nearly four years prior. Declaration of Marcus Koehn (Koehn Decl.) ¶ 2. Koehn contacted Watson regarding the expired tabs. Amended Complaint. ¶ 3.6. While speaking with Watson, dispatch informed Koehn that a warrant was out for the arrest of the Ford LTD's owner, Ross. Koehn Decl. ¶ 3. After receiving this information, Koehn arrested Watson, believing him to be Ross.

Watson attempted to convince Koehn that he was not Ross. *E.g.*, *id*. ¶ 4.[1] Watson informed Koehn that he lived at 20602 Church Lake Drive, he did not own the vehicle, and that he had sold the Ford LTD to Ross. *Id*. Watson informed Koehn that he did not have his driver's license on his person but that it was just inside the door to his residence. *Id*. ¶ 8.

Koehn contends that Watson offered to retrieve his driver's licence from his house. *Id*. Watson disputes this fact – he argues that he did not volunteer to retrieve his license;

---

[1]Watson concedes that the physical description given for Ross would be easily mistaken for a physical description that could be given for him. Watson Deposition (Watson Dep., Dkt. 29 at 15). In fact, (1) Ross was born in 1958, Watson in 1956; (2) Ross was 6'2" and Watson 6'1"; (3) Ross weighed 200 pounds, Watson 210 pounds; and (4) both were white males with blue eyes. Koehn Decl. ¶ 6.

ORDER - 2

rather, Koehn informed Watson that he would need to see Watson's license and that they would all have to go together to obtain his license inside his residence. *E.g.,* Declaration of Christopher J. Watson (Watson Decl., Dkt. 34) at 2; *see also* Deposition of Christopher J. Watson (Watson Dep., Dkt. 29 at 16). Based on the foregoing, the parties dispute whether or not Watson volunteered to obtain his wallet or whether he believed he was compelled to obtain his wallet for the arresting officers. *Compare* Declaration of Marcus Koehn (Koehn Decl., Dkt. 28) ¶ 8 *with* Watson Decl. and Watson Dep.; *see also* Dkt. 33 n. 4 (arguing that Watson involuntarily entered his residence to obtain his license).

At some point, Kocher was also on the scene with Koehn. Koehn maintains that, after Watson offered to retrieve his license, he uncuffed Watson and the officers followed him into his residence. Koehn also claims he entered Watson's residence without making any physical contact with Watson. *Id.* ¶ 9. Koehn then claims that he examined Watson's driver's license in Watson's kitchen/dining area of his residence and determined that Watson appeared to be who he claimed, i.e., not Ross.

In opposition, Watson maintains that the chain of events that led to Koehn and Kocher entering his residence differ from Koehn's and Kocher's recollections. *See e.g.*, Amended Complaint ¶¶ 3.11–3.24 (describing Watson's perception of the events). In his deposition, Watson stated that, while he offered to obtain his license from just inside the doorway of his house, he did not consent to Koehn or Kocher's entry. Watson Dep. at 17. ("And I said, I can walk down into my house and get my driver's license for you, but you can't enter with me without a search warrant."). Watson asserts that he repeatedly informed the officers that he did not consent to Moving Defendants' warrantless entry to his residence. *Id.* at 18 (confirming that his position was "I know you want my driver's license, I will get my driver's license, I'll go into the house and get my driver's license, but you won't come with me . . . .").

Watson and the officers walked to the doorway for Watson to retrieve his license, which was just behind the front door on a counter. *Id*. At this point, Watson maintains that the officers stood outside the doorway and that he stood on the aluminum threshold of the doorway. *Id*. at 19. Watson then contends that Koehn took a step forward and bumped into him and then took a bigger step forward using his hands and chest to bump or push Watson, which knocked Watson backwards and enabled Koehn to enter Watson's residence. *Id*. at 19-21. Watson sustained no physical injuries as a result of the alleged physical contact. *Id*. at 22.

Following this alleged physical contact, Kocher also entered Watson's residence and closed the door behind him. *Id*. at 23. Once inside, the officers confirmed that Watson was not Ross. *See id*. at 22-23. Neither party disputes that Watson's license was provided to the officers inside Watson's residence. *Compare* Koehn Decl. ¶ 10 (claiming that, once inside the residence, Watson provided his driver's license to Koehn, which he examined) *with* Watson Dep. at 22 (claiming that while Watson, Kocher, and Koehn were inside the residence, Kocher closed the door and Koehn grabbed/snatched Watson's wallet from him). However, the parties do dispute how and by what means the Moving Defendants gained entry to Watson's residence. *Id*.[2]

Additionally, neither party disputes that, sometime after their entry, the officers smelled marijuana within Watson's residence, which Watson located for and relinquished to the officers. The officers also conducted a protective sweep of the residence.

Based on these facts, Watson alleges the following causes of action under 42 U.S.C. § 1983 for alleged violations of the Fourth Amendment of the United States

---

[2]Although Watson's neighbor Carolyn Hanna filed a declaration (Dkt. 35) detailing her recollection of the events as she witnessed them from her residence, the factual allegations contained therein are immaterial to resolving Moving Defendants' summary judgment motion. Therefore, to the extent Moving Defendants move to strike the Hanna Declaration, such is denied as moot. *See* Dkt. 37 at 3.

ORDER - 4

Constitution: (1) Koehn and Kocher conducted an unreasonable search and seizure and (2) Koehn used excessive force to gain entry to Watson's residence. Amended Complaint ¶¶ 4.1, 4.2.

### III. DISCUSSION

**A. Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The

nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson,* 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.     Moving Defendants' Motion for Summary Judgment**

   **1.     Qualified Immunity**

Qualified immunity is an entitlement of government officials not to stand trial or face the other burdens of litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Courts apply a two-part analysis in determining whether or not government officials can prevail on their affirmative defense of qualified immunity. *Martinez v. Stanford*, 323 F.3d 1178, 1183 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201-02, (2001)). The Court first inquires whether, taken in the light most favorable to the party asserting injury, the facts show that the government actor's conduct violated a constitutional right – in this case, Watson's Fourth Amendment right to be free from unreasonable search and seizure and the use of excessive force. *See Saucier*, 533 U.S. at 201. If not, the inquiry ends, and the official is entitled to qualified immunity. *Id.* If, however, the alleged facts establish a violation, the inquiry proceeds with the question of whether the constitutional right in question was clearly established at the time of the conduct at issue. *Martinez*, 323 F.3d at 1183.  The relevant, dispositive inquiry in determining whether a right is clearly established is whether, on an objective basis, it would be clear to a reasonable officer that his or her conduct was unlawful in the situation confronted. *Saucier*, 533 U.S. at 202; *see also Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002). Even if an official violated a constitutional right, a reasonable but mistaken belief that his or her conduct was lawful would result in the grant of qualified immunity. Qualified immunity thus provides ample protection to all but the plainly incompetent or those who knowingly

ORDER - 6

violate the law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue." *Davis v. Scherer*, 468 U.S. 183, 197 (1984); *see also Collins v. Jordan*, 110 F.3d 1363, 1369-79 (9th Cir. 1997) ("plaintiff bears the burden of showing that the right he alleges to have been violated was clearly established").

### a. Entry to Watson's Home

Watson argues that his Fourth Amendment right to be free from unreasonable search and seizures was violated when (1) Moving Defendants entered his residence without his consent or a warrant and/or when (2) Moving Defendants caused him to involuntarily enter his residence to retrieve his driver's license for them to examine and verify his identity. Amended Complaint; Watson Dep. at 13-18; Watson Decl. at 2; *see also*, U.S. CONST Amend IV. In opposition, Moving Defendants argue that they did not need a warrant to follow Watson into his home because, at the time, they believed he was Ross and they had lawfully arrested Watson based upon a valid, outstanding warrant for Ross. *E.g.*, Dkt. 27 at 13-16.

#### i. Consented Entry

Moving Defendants rely heavily on a United States Supreme Court case wherein the Court specifically addressed the scope of a police officer's authority to maintain custody over an arrestee. *E.g.,* Dkt. 27 at 14 (citing *Washington v. Chrisman*, 455 U.S. 1 (1982) (hereinafter *Chrisman II*). The Chrisman cases involved a Washington State University police officer who observed a student, Overdahl, exiting a dormitory carrying a half bottle of gin. Because the student appeared under age, the officer stopped him and asked for identification. The student responded that he would have to go to his dormitory room to retrieve the I.D. The officer explained that he would have to accompany the student and the student acquiesced.

ORDER - 7

The dorm room, measuring eleven by seventeen feet, was on the eleventh floor. When the door was opened by the student, the officer stood in the doorway without physically entering the room. From his vantage point, the officer could see Overdahl's roommate, Chrisman, and a small pipe and seeds on a desk in the room. The officer then entered the room for a closer inspection of the items and determined the pipe and the seeds were from the use of marijuana. Both students were given their *Miranda* warnings and consented to a search that yielded more marijuana, cash, and LSD. *Id.* at 2.

The Washington Supreme Court initially suppressed this evidence in *State v. Chrisman*, 619 P.2d 971 (Wash. 1980), *rev'd*, 455 U.S. 1 (1982) (hereinafter *Chrisman I*). The court held that, although Overdahl had been placed under lawful arrest, the officer had no right to enter the room and seize the contraband without a warrant, and the subsequent search of the room was fruit of the initial entry and anything found should have been suppressed. The court found specifically that there was no indication that Overdahl might obtain a weapon or destroy evidence, and with the officer blocking the only exit from the room, his presence inside the room was not necessary to prevent escape. *Id.* at 975.

The United States Supreme Court reversed and remanded in *Chrisman II*. The Court found that the Washington court's view that the police officer was not entitled to accompany Overdahl from the public corridor to his room, absent a showing that such intervention was required by exigent circumstances, was a "novel reading of the fourth amendment." The Court held,

> that it is not "unreasonable" under the [f]ourth [a]mendment for a police officer, as a matter of routine, to monitor the movements of an arrested person, as his judgment dictates, following the arrest. The officer's need to ensure his own safety-as well as the integrity of the arrest-is compelling. Such surveillance is not an impermissible invasion of the privacy or individual liberty of an individual who has been arrested.

*Chrisman II*, 455 U.S. at 7 (footnote omitted). The *Chrisman II* Court further held that when an officer places a suspect under lawful arrest, the officer has "a right to remain

ORDER - 8

literally at [the suspect's] elbow at all times; nothing in the Fourth Amendment is to the contrary." *Id.* at 6; *U.S. v. Brown* 951 F.2d 999, 1005 (9th Cir. 1991) (officers did not violate the individual's Fourth Amendment rights when they accompanied the arrestee into the residence to obtain identification); *U.S. v. Chase*, 692 F.2d 69, 71 (9th Cir. 1982) (recognizing that, when officers lawfully detain a suspect in the front yard of his residence, they "could stay at his elbow" when he elected to reenter his residence).

Moving Defendants argue that little difference exists between the facts of *Chrisman II* and this case. Watson, like Overdahl, was placed under valid arrest outside his residence.[3] Watson, like Overdahl, reentered his residence to obtain identification to prove to the officer that he should not be arrested.

Watson's primary argument on this issue is that he, unlike Overdahl, did not consent to Moving Defendants' entry into his residence and informed them that any entry would require a warrant. *E.g.*, Dkt. 33 at 16.

With respect to consent, several circuits have held that, once an arrest is lawfully effected outside a person's residence, consent is not required for an officer to accompany an arrestee into his residence for purposes of obtaining identification. *E.g., U.S. v. Harness*, 453 F.3d 752, 756 (6th Cir. 2006). Similar to Watson, Harness argued that the police gained entry to his home without consent. However, the *Harness* court noted that such an argument misses the point:

> The issue is not consent but the risks officers would incur by allowing an arrested criminal suspect to roam freely about his home: risks to officer safety, risks of the destruction of evidence, risks of escape – risks that officers must "presume[ ]" surround "[e]very arrest." *Chrisman*, 455 U.S. at 7. The deputies had authority to follow Harness into the residence not because he told them they could but because they had legitimately placed him in custody and therefore had a right to keep him within their control-something they assuredly could not do if they allowed him to enter the house by himself. *See United States v. Berkowitz*, 927 F.2d 1376, 1389

---

[3]Watson does not and likely could not challenge the arrest on the basis that he was not Ross, the suspect for which Moving Defendants had an arrest warrant.

ORDER - 9

(7th Cir. 1991) (An "officer's authority to monitor a suspect does not depend on the suspect's consent; a suspect under arrest has no right to wander off on his own.").

*Id.*

Further support for Moving Defendants' position that their allegedly unconsented entry to Watson's home did not violate the Fourth Amendment search and seizure provisions is found in the *Berkowitz* opinion:

> When the police assert from outside the home their authority to arrest a person, they have not breached the person's privacy interest in the home. If the person recognizes and submits to that authority, the arrestee, in effect, has forfeited the privacy of his home to a certain extent. At that point, it is not unreasonable for the police to enter the home to the extent necessary to complete the arrest. A person who has submitted to the police's authority and stands waiting for the police to take him away can hardly complain when the police enter his home briefly to complete the arrest.
>
> ***
>
> It is a different matter, however, for the police to enter a person's home, without his consent, before announcing their authority to arrest. In that case, the arrestee has not forfeited his privacy interest in the home; he has not relinquished his right to close the door on the unwanted visitors.

*Berkowitz*, 927 F.2d at 1387;

The case at bar presents the first situation discussed in *Berkowitz*, proper arrest or custody effected outside the home prior to the arresting officers' entry into Watson's residence. *See id*. Therefore, whether Moving Defendants' entry was consented or unconsented is irrelevant in this case because the entry followed both Watson's lawful arrest outside his residence and his reentry to his house to obtain his identification.[4]

### ii. **Involuntary/Compelled Entry**

As discussed above, the parties dispute whether Watson volunteered to retrieve his licence or whether Moving Defendants compelled him to do so. *Compare* Declaration of Marcus Koehn (Koehn Decl., Dkt. 28) ¶ 8 *with* Watson Decl. and Watson Dep.; *see also*

---

[4]Watson relies on several automobile search cases and cases that involve pre-arrest situations; these cases are either inapplicable or not on point and are, therefore, not discussed herein. *See generally* Dkt. 33.

ORDER - 10

Dkt. 33 n. 4 (arguing that Watson involuntarily entered his residence to obtain his license). To support his argument on compelled entry, Watson relies solely on out-of-Circuit cases, both published and unpublished.

First, he cites to *Harness*, which contains a statement that may imply that compulsion may be a factor that affects the validity of the type of entry complained of in this case. Dkt. 42 at 4 (citing *Harness*, 453 F.3d at 756 (stating that "[t]he officers did not compel him to enter his house. And while Harness may in retrospect have regretted his decision to re-enter the house, he does not claim that the decision was anyone else's but his")). While this sentence in *Harness* is facially helpful to Watson's position, it is dicta from an out-of-Circuit court. *See* 453 F.3d at 756 (court not presented with facts of involuntary, i.e., compelled entry). Nonetheless, *Harness* is unavailing to Watson because, as is discussed below, Watson decided to reenter his house and has not provided competent evidence that someone other than him made that decision.

Watson next cites to *United States v. Walker*, 673 F. Supp. 292 (N.D. Ill. 1987). Dkt. 42 at 4. In *Walker*, the district court considered whether Walker was compelled or voluntarily entered a room within his residence to obtain clothing other than pajamas – the police remained at his elbow and thereafter found stolen mail. The district court in *Walker* concluded that *Chrisman* did not justify the officers following Walker when they directed him to go to get dressed. 673 F. Supp. at 298.

While *Walker* supports Watson's position, other courts have consistently reached a decision contrary to *Walker*. *E.g., State v. Birminham*, 132 S.W. 3d 318, 325 (Ct. App. Mo. 2004) (applying *Chrisman* and following numerous other courts in holding that it is "irrelevant whether a defendant requests clothing or the police are the *motivating force* for him or her getting dressed.") (emphasis added). The *Birminham* court held the issue of compulsion irrelevant, relying on the following cases: *United States v. Gwinn*, 219 F.3d 326 (4th Cir. 2000) (adopting reasoning from Second and Tenth Circuit regarding a

ORDER - 11

clothing exigency, which leaves irrelevant whether entry or reentry was voluntary or compelled) (citing *United States v. Butler*, 980 F.2d 619 (10th Cir. 1992); and *Di Stefano*, 555 F.2d 1094 (2nd Cir. 1977)). 132 S.W. 3d at 325 (collecting cases). The *Birmingham* court also relied on Professor LaFave's treatise on criminal law, which explains the following with respect to compelled/voluntary reentry to an arrestee's residence:

> If the defendant is placed under arrest at a particular place in the premises, even at the front door, the circumstances may be such that he will be allowed to move about the premises prior to departure for the police station. Although this may occur for other reasons as well, it occurs with greatest frequency when the defendant needs to change his clothes or put on additional clothing before departing. Often the defendant will ask that he be allowed to do this, although on some occasions it appears that the police have been the motivating force in causing the defendant to seek out other clothing. In either event, the courts have had little hesitancy in holding admissible evidence discovered by the police as a consequence.

2 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment,* § 6.4(a), at 636 (2d Ed. 1987). These cases and LaFave's treatise on the Fourth Amendment cut against Watson's reliance on *Walker* and his interpretation of the breadth of *Chrisman's* "at-the-elbow" rule. Watson does not distinguish between clothing cases and license cases; indeed, *Walker*, which is cited by Watson, is a clothing case. And Watson has not supplied any authority dealing directly with an arrestee's reentry that was compelled by law enforcement to obtain identification. Without such authority, this Court would be adopting a new principle of law to conclude that such a distinction can be made and that such a constitutional right exists to protect a person like Watson against an officer's entry in cases such as this.

In short, the cited authority does not adequately establish that, once arrested, an arrestee has a constitutional right to be free from officers following him into his house when he re-enters his home to obtain identification, whether he chooses to do so or

ORDER - 12

whether he is directed (i.e., compelled) to do so by the officers.[5] Indeed, the case law suggests that the opposite is the case or that it is at least the majority rule, which means, or at least suggests, that the constitutional right Watson asserts does not exist.

Even if such a right exists, Watson has not provided authority that such a right was clearly established at the time of the incident in question. Such a right could not have been clearly established if, to find such a right, the Court would first have to adopt a new principle that is (1) without on-point authority from this circuit; (2) based on an inference from dicta in another case (*Chrisman*); and/or (3) based on one line of reasoning (*Walker*) that differs from another line of reasoning (*e.g., Butler, Di Stefano*). It is Watson's burden to provide such authority. Here, however, the parties extensively researched this narrow question and came up with only a few cases that are not from this circuit and either conflict with or are not supportive of Watson's position. Thus, the right Watson argues is present has not been shown to be clearly established at the time of the conduct at issue.

Even if Watson had shown that such a right was clearly established, he would still have to prove that he was compelled to reenter his house, i.e., that it was not his decision. Watson relies on *Harness* in so arguing that he was ordered, rather than decided, to reenter his house to retrieve his wallet. *E.g.,* Dkt. 42 at 3-4 (citing *Harness*, 453 F.3d at 756). In *Harness*, the Sixth Circuit stated the following:

---

[5]Ample authority exists for the proposition that officers may accompany an arrestee when he/she volunteers to enter his/her house to obtain personal items like a driver's license. *E.g.*, *Berkowitz*, 927 F.2d at 1389 (7th Cir. 1991) (holding that where an arrestee asked to retrieve his keys from a room in his house, officers could follow him into that room); *United States v. Di Stefano*, 555 F.2d 1094, 1101 (2d Cir. 1977) ("Having permitted [the arrestee] to retire to her bedroom to dress, [the officer] was clearly justified in accompanying her to maintain a 'watchful eye' on her and to assure that she did not destroy evidence or procure a weapon."); *Harness*, 453 F.3d at 756 ("the deputies plainly had authority to follow Harness into his house when he sought to retrieve his keys, wallet and cigarettes . . . ."). Applied here, there is no question that the officers could have followed Watson into his residence when he went to retrieve his wallet, if he did so voluntarily.

ORDER - 13

> Nor does it make a difference that the officers, rather than Harness, initially asked whether Harness "needed anything . . . inside the house." *The officers did not compel him to enter his house*. And while Harness may in retrospect have regretted his decision to re-enter the house, he does not claim that the decision was anyone else's but his. "[I]ncreasing a suspect's options"– here by providing an option that many suspects (without evidence of a crime in plain view inside the home) would welcome – "cannot harm him," and "a suspect's poor choice does not render unconstitutional an officer's objectively reasonable offer." *United States v. Garcia*, 376 F.3d 648, 651 (7th Cir. 2004).

453 F.3d at 756 (emphasis added). Putting aside for the moment that this portion of the *Harness* opinion is dicta and from a different circuit, discussed above, the Court examines the relevant facts as alleged by Watson.

Watson's position is that, if he was compelled to reenter his residence to obtain his license, a fact finder may conclude that Moving Defendants' entry violated Watson's Fourth Amendment right to be free from unreasonable search and seizure. *See, e.g., id*. The following portions of Watson's deposition shed light on this issue:

> Q: And what happened next?
> A: Well, he said, there's a warrant out for the owner of this car, and then he said, turn around, and he put handcuffs on me.
> \*\*\*
> Q: Did he ask you for any identification before you were handcuffed?
> A: Yes
> Q: What did you say?
> A: I said, I don't have any identification on me . . . .
> \*\*\*
> Q: Now, the handcuffs are off and would you please take me through the rest of the conversation with Officer Koehn.
> A: Okay. He said to me, I'm going to need to see your driver's license. And I said, driver's license is in my home just inside the door.
> \*\*\*
> Q: But did officer Kocher or Officer Koehn say anything about going into the house to find out if anyone else was there or were they saying they wanted you to go get your driver's license?
> A: They said – one of the – I believe Officer Koehn said, we're going to need to see your driver's license.
> Q: And what did you say?
> A: I said to Officer Kocher, Detective Kocher, I said, you can't go into my house without a search warrant. And I said, *I can walk down into my house and get my driver's license for you*, but you can't enter with me without a search warrant.
> Q: Okay. So why did you say you would do that for them, go get your driver's license?
> A: Well, I – to verify who I was.

ORDER - 14

> Q: You understand that – whatever your belief was or your opinion was you clearly understood that they wanted to see your driver's license?
> A: Uh-huh, yes.
> Q: And that *you said you would go get it?*
> A: *Yes*.
> Q: And What else did you say to them after that, if anything?
> A: Well, when I said, you can't go into my house without a search warrant, Detective Kocher said, we don't need a search warrant to go into your house. And I said, yes, yes you do. And he said, if you don't have anything to hide inside the house you shouldn't mind having us go into you home.
> Q: Did you say anything in response?
> A: I again – twice I told him he was going to need a search warrant. And then both officers were there, one of them said, *let's go into your house and get your driver's license*. And I said, it's just inside the door, I'll get it. . . .
> Q: So if I understand your position with the officers it was, *I know you want my driver's license*, *I will get my driver's license, I'll go into the house and get my driver's license*, but you won't come with me?
> A: *Yes*.

Watson Dep. at 13-18 (emphasis added); *see also* Amended Complaint ¶ 3.16 (alleging that Watson did not volunteer to retrieve his license); Watson Decl. at 2 (same).

Contrary to Watson's position, his own statements confirm that he offered to get his license but did so on a condition that the officers stayed outside and waited for him. In other words, while he offered (volunteered) to go and retrieve his license, he did not consent to the officer's entry. However, consent is irrelevant and the fact remains that he offered or volunteered to obtain his license; it was his decision to reenter. It is not as though Watson refused to reenter his house and the officers ordered him in anyway; he simply made it known that he could and would go retrieve his license but he did not consent to the officer's following him in, which is irrelevant.

Even if Watson subjectively believed that the arresting officers compelled his reentry to his residence, the officers acted in an objectively reasonable manner to conclude that Watson chose to secure his release by obtaining his driver's license from within his residence with the officers at his side, rather than being transported to the police station for booking. Thus, from the officers' point of view, they did not compel Watson to reenter his house and they did not violate or intend to violate his Fourth

ORDER - 15

Amendment rights to unreasonable search and seizure; Watson has not provided competent evidence to the contrary.

In short, the foregoing analysis establishes all or at least some of the following: (1) Watson did not have a constitutional right to be free from the entry complained of in this case; (2) even if such a right existed, it was not clearly established at the time of the conduct at issue; (3) officers do not need the consent of an arrestee to stay at his elbow when he decides to reenter his house to obtain identification; and/or (4) Moving Defendants cannot be said to have compelled Watson to enter his house to obtain his identification when he is the one who offered to obtain it for them even though he did not consent to their following him into the house.

### iii. Qualified Immunity

Based on the foregoing, the Court concludes that Moving Defendants are immune from suit on this claim based on the affirmative defense of qualified immunity.

### b. Excessive Force By Koehn Entering Watson's Home

To prevail on a § 1983 excessive force claim, a plaintiff must show that the officer's actions were objectively unreasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 388 (1989).

Officers may only use "objectively reasonable" force under the circumstances, which is determined by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (citations and internal quotations marks omitted). Governmental interests are examined in light of the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest." *Id.*

Watson claims that the single push, or body-blow, he received from Koehn, when Koehn stepped through his doorway causing physical contact between them, was

constitutionally excessive. When weighed against the government's interest in this case, the minimal intrusion was objectively reasonable under the circumstances. It must be remembered that Watson was believed to be Ross and, when he retrieved his wallet, he did so by reaching around a door for an object not visible to the officers. The officers in their judgment had a right to remain at the elbow of Watson, if necessary, to monitor his movements. The proper inquiry should not be based on hindsight. "Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers violates the Fourth Amendment." *Id.* Based on the record before the Court, Watson has not supplied competent evidence that could establish that Koehn used excessive force to gain entry to Watson's house, entry that was otherwise lawful.

Even if Watson could establish that the level of force used by Koehn in entering his residence was "excessive," Koehn is entitled to summary judgment based on qualified immunity because it was not clearly established that his actions – stepping into and bumping, or body-blowing, Watson and causing him to stumble backwards into his residence – violated Watson's constitutional rights. The contours of the right against excessive force in this context were not clearly established at the time that a reasonable officer would have known that his conduct was unlawful. *See Saucier*, 533 U.S. at 202, 205-07; *see also Graham*, 490 U.S. at 388.

Therefore, the Court grants summary judgment in favor of Moving Defendants on this issue.

**2.    Watson's Other Claims**

Watson argues that the officers exerted excessive force upon him once inside his home, separate from alleged forced used to gain entry.[6] Watson further alleges that the

---

[6]Watson initially asserted that Koehn used excessive force when he assisted Watson in getting up from a chair that he sat in during the time he and Moving Defendants were inside his residence during the seizure of marijuana. Moving Defendants moved for summary judgment on this allegation and Watson did not file papers in

ORDER - 17

subsequent protective sweep and arrest for possession of marijuana were violative of his rights because the officer's entry to the house was unlawful in the first place.

Watson's arguments on these claims are predicated on the Fourth Amendment claim dismissed above. Because Watson does not prevail on that claim, the Court grants summary judgment as to these derivative issues in favor of Moving Defendants.

## IV. ORDER

Therefore, it is hereby **ORDERED** that Moving Defendants' motion for summary judgment based upon their claim of qualified immunity is **GRANTED** as discussed herein. There being no other parties or claims in this action, the case is **CLOSED**.

DATED this 11th day of July, 2011.

_____
BENJAMIN H. SETTLE
United States District Judge

---

opposition.

Pursuant to Local Rule CR 7(b)(2), the Court finds Moving Defendants' position to be meritorious and a basis for granting summary judgment. Further, review of the record also establishes that Watson has failed to supply competent evidence that, if believed, could establish the truth of this allegation. Additionally, Watson has failed to supply competent evidence to establish that Koehn would not be entitled to qualified immunity on this issue. The foregoing is an alternative basis for granting Moving Defendants' motion for summary judgment on this issue.

ORDER - 18